1
2
3
4                    UNITED STATES DISTRICT COURT
5                  NORTHERN DISTRICT OF CALIFORNIA
6

7     RYAN KELLER, et al.,                    Case No. 25-cv-01892-AMO
8                    Plaintiffs,
                                              ORDER GRANTING MOTION TO
9          v.                                 DISMISS FIRST AMENDED
                                              COMPLAINT
10    AUTOMATTIC INC., et al.,
                                              Re: Dkt. No. 36
11                   Defendants.

12          This is a putative class action arising from an alleged "nuclear war" Defendants

13   Automattic Inc. and Matthew Charles Mullenweg waged against WPEngine Incorporated

14   ("WPE").  Plaintiffs Ryan Keller and Sharon Schanzer, and their respective businesses, Keller

15   Holdings LLC and RLDGROUP, are WPE customers who allege they suffered harm as a result of

16   the actions Defendants took against WPE between September 24, 2024 and December 10, 2024.

17          Based on Defendants' alleged misconduct, Plaintiffs assert claims for: (1) intentional

18   interference with contractual relations, (2) intentional interference with prospective economic

19   relations, and (3) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof.

20   Code §§ 17200, *et seq.*  First Amended Complaint ("FAC") (Dkt. No. 30) ¶¶ 74-80, 81-90, 91-

21   101.  Defendants move to dismiss all three claims.  Motion to Dismiss ("Mot.") (Dkt. No. 36);

22   Reply in Support of Motion to Dismiss ("Reply") (Dkt. No. 45).  The Court addresses each in turn.

23          The elements of Plaintiffs' claim for intentional interference with contractual relations are

24   "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this

25   contract; (3) defendant's intentional acts designed to induce a breach or disruption of the

26   contractual relationship; (4) actual breach or disruption of the contractual relationship; and

27   (5) resulting damage."  *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1191 (9th Cir. 2022)

28   (internal quotations and citation omitted).

United States District Court
Northern District of California

United States District Court
Northern District of California

Defendants contend that Plaintiffs have failed to adequately plead knowledge, intent, and actual breach or disruption. Mot. at 11-15. To establish knowledge, Plaintiffs point to the following allegations:

- "Defendants have no justifiable reason for interfering in the contracts between Plaintiffs and WPE, and indeed they are actively seeking to capitalize on the disruption they themselves caused. Both WordPress.com and Pressable, web-hosting platforms owned by Defendants which compete with WPE, have been running major advertising campaigns offering to buy out WPE customers including advertising that their products have better 'performance, security, and support.' These advertising campaigns started immediately after Defendants blocked WordPress.org services from WPE, which caused decreased performance of WPE customer websites, security issues due to no longer having access to the central repository, and limited the website support that WPE could offer its customers due to being cut off from the central repository. Indeed, these advertising campaigns seeking to capitalize on Defendants' deliberate disruption of WPE services are ongoing." FAC ¶ 8 (footnote omitted).

- "Moreover, Defendants have utilized their position and access to WordPress core systems to publish a list of WPE customers and their websites, including websites owned by Plaintiffs, in an effort to pressure website owners to cease using WPE services. On December 10, 2024, a district court issued an injunction ordering Defendants to take down this list of websites, including those of Plaintiffs. *See* Case No. 24-cv-06917-AMO Dkt. No. 17." *Id.* ¶ 9.

- "Almost immediately after Defendants blocked WP Engine, Defendants' companies, such as Pressable, began an advertising campaign aimed at stoking customer backlash in an attempt to convince customers to break their contracts with WPE." *Id.* ¶ 38.

- "While Defendants claim that their decision to block access by Plaintiffs and Class Members was a typical cessation of business relationships during ongoing litigation, it was anything but. WPE has produced voluminous evidence that the so-called trademark dispute is a mere pretext to sabotage WPE's services and relationship with its customers. This evidence includes, but is not limited to, numerous text messages from Mullenweg threatening WPE if it refused to pay at least 8% of their revenue to Automattic, Mullenweg's for-profit company, including threatening a 'nuclear war' if his demands were not met; statements from Mullenweg indicating the fees he sought were based on what he thought WPE could afford, rather than what the value of the trademark actually was; WPE's own longstanding use of the 'WP' nomenclature, which was expressly permitted on the WordPress foundation website; and engaging in unprecedented and malicious conduct utterly unrelated to the trademark dispute, such as seizing control of the popular ACF (Alternate Custom Fields) Plugin." *Id.* ¶ 41 (footnotes omitted).

- "Defendants have made no secret that their intent is to induce Plaintiffs and Class

2

Members to leave WPE by degrading the services WPE provides to its paying customers. When Defendant Mullenweg was asked about WPE customers who were harmed because 'all of those millions of websites that depend, that are still running on WPEngine because they cannot get updates,' Mullenweg responded: 'Who pays any dollars to WordPress.org? [to the audience] No hands, right? There's nothing to pay for, it's all free. But people are paying 400 million dollars to WPEngine that promises them security, updates, hosting, et cetera. So they were selling the free stuff on WordPress.org to their customers. And then when we turned them off, they got mad.' " *Id.* ¶ 43 (footnote omitted).

- "As Mullenweg himself acknowledged, customers, including Plaintiffs and Class Members, were paying WPE $400 million to manage the 'free stuff' from WordPress.org including contractual promises of 'security, updates, hosting, et. cetera.' By Mullenweg's own admission, he turned off the services that WPE was selling to its customers, deliberately inhibiting the services and contracts between WPE and Plaintiffs and Class Members." *Id.* ¶ 44

- "As Defendants have repeatedly stated, they anticipate many more people will be compelled to leave WPEngine as a result of their self-described campaign of 'scorched earth nuclear war' against WPE. In Defendants' self-proclaimed war, hurting innocent class members is not by accident; it is the intended result. Even customers who have stayed with WPE nevertheless suffered months of significantly degraded service worth far less than they paid for because of Defendants' deliberate attempt to leverage their power and control over the WordPress ecosystem to cripple a competitor (and its customers) and redirect Plaintiffs and Class Members to Defendants' own for-profit businesses." *Id.* ¶ 64.

- "At all relevant times, Defendants knew that class members maintained valid contracts with the third party WPE." *Id.* ¶ 76

- "As alleged herein, Defendants deliberately acted with the intent to disrupt those contracts through cutting off WPE's access to WordPress's technology, software, Plugins, and other tools thereby ensuring that WPE could not fully fulfill its contractual obligations to the Plaintiffs and Class Members for website hosting and related services, or if WPE could find a workaround to block of access to WordPress's technology, software, Plugins, and other tools to fulfill its obligations, it made performance of WPE's contracts with its customers more expensive and difficult." *Id.* ¶ 77.

- "Plaintiffs and Class Members have been and will be harmed, and Defendants know of this harm (including because Defendants, including Mullenweg, acknowledged the harm in interviews and have made public statements concerning the harm) and were a substantial factor in its cause." *Id.* ¶ 80.

///
///
///

3

United States District Court
Northern District of California

1    Plaintiffs contend that Mullenweg's public comments alone "suffice to allege knowledge

2    of the nature of WPE's contractual relationships with Plaintiffs and the Class[,]" and that "[t]here

3    is no genuine dispute that Defendants knew WPE[] formed contracts with its customers."  Opp. at

4    9.  However, WPE is not a plaintiff here, and Plaintiffs cannot plead a plausible claim by

5    reference to the allegations and evidence on which WPE relied in its litigation against Defendants.

6    To prevail on their interference claims in this action, Plaintiffs must allege facts that plausibly

7    show Defendants were aware of Plaintiffs' contracts with WPE, not just that Defendants were

8    aware WPE had contracts with its customers, which happened to include Plaintiffs.[1]  *See hiQ*

9    *Labs, Inc.*, 31 F.4th at 1192 (affirming preliminary injunction order where plaintiff was likely to

10   establish that defendant knew of about its existing contracts because its response to the

11   defendant's cease-and-desist letter identified both current and prospective clients); *Sebastian Int'l,*

12   *Inc. v. Russolillo*, 162 F. Supp. 2d 1198, 1204 (C.D. Cal. 2001) (finding plaintiff's evidence of

13   knowledge sufficient to survive summary judgment where the plaintiff had informed defendant of

14   its distribution methods and provided a representative list of clients); *Bear Down Brands, LLC v.*

15   *Bora Servs.*, No. SACV 22-01998-CJC (DFMx), 2023 WL 5167355, at *2 (C.D. Cal. May 25,

16   2023) (finding claim for intentional interference with contractual relations sufficiently pleaded

17   where, among other things, the plaintiff alleged that the defendant knew about the plaintiff's

18   contracts with authorized retailers and distributors).

19   Plaintiffs' reliance on *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1092 (9th Cir.

20   2005) for the proposition "[w]hen the defendant performs the act that causes the interference, the

21   defendant need not know exactly who is a party to the contract, so long as he knows he is

22   interfering with a contractual relationship[,]" is misplaced.  There, the Ninth Circuit nonetheless

23   reiterated the knowledge requirement that applies here, which Plaintiffs have not met:

24           For purposes of alleging the two state law torts Altera has alleged,
             interference with contractual relations and inducing breach of a
25           contract, Altera must prove not only that Clear Logic knew a
             contract existed, but must prove, as an element of the breach of
26           contract claim, that a valid contract existed.  The terms of a contract

27

28   _____
     [1] Because the claim fails for this reason, the Court does not reach Defendants' remaining
     arguments for why dismissal is appropriate on this claim.

                                          4

on paper, with no evidence that any parties agreed to those terms, do not prove the existence of a valid contract.

*Id.*

Accordingly, Plaintiffs' claim for intentional interference with contractual relations is **DISMISSED WITH LEAVE TO AMEND**.

Plaintiffs next assert a claim for intentional interference with prospective economic relations. The elements of that claim are: "(1) an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic harm to the plaintiff proximately caused by the acts of the defendant." *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1108 (9th Cir. 2007) (*citing Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003)).

Defendants contend Plaintiffs fail to sufficiently plead knowledge, intent, actual disruption, or a prospective economic relationship. Mot. at 11-16. In opposition, Plaintiffs identify the following allegations in support of this claim:

- "Mullenweg's statements in that interview are *far* from the only statements he has made. As the district court held in its order enjoining Defendants' unlawful conduct: 'Defendants' conduct is designed to induce breach or disruption. That is made explicit in at least the following posts and texts which state, in part:

    • 'I know that this is the nuclear option, it sets us down a specific path.' Brunner Dec. ¶ 28 & Ex. F.

    • 'If you're saying 'next week' that's saying 'no,' so I will proceed with the scorched earth nuclear approach to [WPEngine].' *Id.* ¶ 31 & Ex. F.

    • 'I don't think they're worth a fraction of that now. Customers are leaving in droves. . . . It's a distressed asset.' Jenkins Decl. ¶ 11 & Ex. 10.

    • 'I suspect there are going to be millions of sites moving away from [the ACF Plugin] in the coming weeks.' *Id.* ¶ 12 & Ex. 11.

    • 'Hmm, I guess you'll have to wait and see why people might not trust ACF as much going forward.' Brunner Decl. ¶ 58 & Ex. I.'"

Case No. 3:24-cv-06917-AMO (Dkt. 64 at 29:13-23)." FAC ¶ 45 (emphasis and

United States District Court
Northern District of California

modifications in original).

- "There are voluminous statements in the public domain and in the district court's record in the above-referenced case, which unambiguously demonstrate Defendants' intent to disrupt the relationship between WPE, Plaintiffs, and the putative class. Defendants' intent to disrupt the relationship between WPE, Plaintiffs, and the putative class is further established by their marketing, which deliberately targeted concerns about the WPE uncertainty that Defendants themselves caused, and their public statements about how they were going to poach the harmed WPE customers." *Id.* ¶ 46.

- "Defendants' interference significantly impacted the business of Plaintiff Keller. While Plaintiff Keller was happy with WPE services and intended to continue using WPE services, the service disruption and degraded service, coupled with repeated public statements and threats made by Defendants, led Plaintiff Keller to explore moving his website and all those operated by his business to another managed web host.  In fact, Plaintiff Keller purchased web hosting services from Nexcess and paid $1,640.00 for alternate services due to the likelihood that he would have to move his clients from the WPEngine platform because of the service disruption." *Id.* ¶ 48.

- "Plaintiff Keller's livelihood revolves around building and operating websites, and significant disruptions will impact his business including his own capacity to fulfill his contractual obligations to his own clients." *Id.* ¶ 49.

- "Plaintiff Keller's websites were significantly impacted by outages despite WPE's attempts to create workarounds." *Id.* ¶ 50.

- "Plaintiff Keller had to spend significant time and expense responding to the service disruptions and degradations, preparing for moving his and his clients' websites to a new host, and in investigating a new host environment after a long and successful prior partnership with WPE.  He is not alone in the harm he has suffered." *Id.* ¶ 51.

- "Plaintiff Keller's own website [that] he uses for his business was also significantly impacted.  Access to the WordPress backend was available intermittently, and Plaintiff Keller received emails related to this downtime." *Id.* ¶ 52.

- "If the district court had not issued its December 10 preliminary injunction, Plaintiff Keller would have had no choice but to move his websites away from WPEngine.  Indeed, if the preliminary injunctive relief is not made permanent, Plaintiff Keller would move his services away from WPE to another web host, and already spent money to purchase additional web hosting services for his client's websites in the event that a migration is necessary." *Id.* ¶ 55.

- "Defendants' interference also significantly impacted the business of Plaintiff Schanzer.  While Plaintiff Schanzer was happy with WPE services and intended to continue using WPE services, the service disruption and degraded service, coupled

6

with repeated public statements and threats made by Defendants, caused Plaintiff Schanzer to start exploring other options for web hosting services for her clients." *Id.* ¶ 57.

- "Plaintiff Schanzer's livelihood revolves around building and operating websites, and the significant disruptions caused by Defendants impacted her existing and future business.  In fact, due to Defendants' causing the service disruption at WPE, Plaintiff Schanzer had to provide a 50% discount to one of her clients because she could not fulfill her obligations to her client." *Id.* ¶ 58.

- "The websites Plaintiff Schanzer manages and provides web hosting services for were significantly impacted by outages despite WPE's attempts to create workarounds." *Id.* ¶ 59.

- "Plaintiff Schanzer had to spend significant time and expense responding to the service disruption and degradations, potentially preparing to move her client's websites to a new host, and investigating comparable web hosting services." *Id.* ¶ 60.

- "If the district court had not issued its December 10 preliminary injunction, Plaintiff Schanzer would have had no choice but to move her clients' websites away from WPEngine at very significant expense." *Id.* ¶ 62.

Assuming, without deciding, that Plaintiffs have adequately pleaded the knowledge, intent, actual disruption elements of this interference claim, the above allegations do not establish "an economic relationship between the plaintiff and some third party, with the probability of future economic benefit to the plaintiff."  *See CRST Van Expedited, Inc.*, 479 F.3d at 1108.  Even the most concrete allegation Plaintiffs put forward, i.e., that "significant disruptions caused by Defendants impacted [Schanzer's] existing and future business[,]" lacks factual content suggesting a "reasonabl[e] probab[ility] that the prospective economic advantage would have been realized but for defendant's interference."  *See AlterG, Inc. v. Boost Treadmills LLC*, 388 F. Supp. 3d 1133, 1151 (N.D. Cal. 2019) (internal quotations and citation omitted).  To the extent Plaintiffs rely on their current contracts with WPE to establish the requisite economic relationship, their claim nonetheless fails based on the current allegations in the operative complaint.  *See Finato v. Keith Fink & Assocs*, No. 2:16-CV-06713-RGK-AJW, 2017 WL 7202104, at *7 (C.D. Cal. Jan. 19, 2017) ("[Because] Defendants allegedly interfered with an existing Individual Settlement, Defendants did not interfere with prospective economic relations.").

Accordingly, Plaintiffs' claim for intentional interference with prospective economic

United States District Court
Northern District of California

relations is **DISMISSED WITH LEAVE TO AMEND**.

Plaintiffs' remaining claim for violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, is predicated on the interference claims. *See* FAC ¶¶ 94-99; Opp. at 15 (arguing that "properly pled tortious interference claims qualify as economic harm under the UCL"). Because those claims are dismissed for the reasons discussed above, the Court does not reach the parties' arguments with respect to the derivative UCL claim, which must also be **DISMISSED WITH LEAVE TO AMEND**.

For the reasons set forth above, Defendants' motion to dismiss is **GRANTED**. Plaintiffs may file a second amended complaint curing the deficiencies discussed above within 30 days of this order. They may not otherwise add new substantive allegations, plead new claims, or name additional parties without Defendants' consent or leave of Court. The Court notes that Plaintiffs attempted to incorporate materials from WPE's related case by reference in their operative complaint, *see e.g.*, FAC ¶ 46 ("There are voluminous statements in the public domain and in the district court's record in the above-referenced case[.]"). Plaintiffs are on notice that the Court does not permit incorporation by reference in this manner, *see, e.g.*, Standing Order for Civil Cases ¶ H.3 (explaining that incorporating prior arguments by reference creates substantial administrative burdens), and the Court will not search through multiple documents or dockets for content that should be properly pleaded by Plaintiffs in their complaint. Courtesy copies of the second amended complaint and the redline required by the Court's Standing Order for Civil Cases is due to chambers within 3 days of filing.

**IT IS SO ORDERED.**

Dated: December 16, 2025

ARACELI MARTÍNEZ-OLGUÍN
**United States District Judge**