1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SCHUBERT JONCKHEER & KOLBE LLP**
ROBERT C. SCHUBERT (S.B.N. 62684)
rschubert@sjk.law
AMBER L. SCHUBERT (S.B.N. 278696)
aschubert@sjk.law
DANIEL L.M. PULGRAM (S.B.N. 354569)
dpulgram@sjk.law
2001 Union Street, Suite 200
San Francisco, California 94123
Telephone: (415) 788-4220

**TYCKO & ZAVAREEI LLP**
SABITA J. SONEJI (S.B.N. 224262)
ssoneji@tzlegal.com
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808

*Counsel for Plaintiffs*

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

RYAN KELLER and SHARON SCHANZER,
individually and on behalf of their businesses,
KELLER HOLDINGS LLC (DBA
SecureSight) and RLDGROUP, and on behalf
of all others similarly situated,

     *Plaintiffs,*

v.

AUTOMATTIC INC., a Delaware corporation,
and MATTHEW CHARLES MULLENWEG,
an individual,

     *Defendants.*

No. 3:25-cv-01892-AMO

**SECOND AMENDED CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

     Plaintiff Ryan Keller and Plaintiff Sharon Schanzer ("Plaintiffs"), on behalf of their businesses, Keller Holdings LLC and RLDGROUP, and on behalf of all others similarly situated, by and through counsel, bring this action against Automattic Inc. ("Automattic") and Matthew Charles Mullenweg ("Mullenweg") (collectively "Defendants"). Plaintiffs' allegations herein are

Second Amended Class Action Complaint                             1

based upon personal knowledge as to their own acts, and based upon their investigation, their counsels' investigation, and information and belief as to all other matters.

## SUMMARY OF ACTION

1.  This case involves Defendants' deliberate abuse of their power and control over the WordPress ecosystem to purposefully, deliberately, and repeatedly disrupt contracts between Plaintiffs and the putative class, and the third-party business WPEngine Incorporated ("WPEngine" or "WPE"). Seeking to injure WPE and resolve a purported dispute between Defendants and WPE, Defendants intentionally disrupted Plaintiffs' and class members websites' access to the necessary core open-source WordPress repository because Defendants knew the websites were hosted by WPE. Indeed, Defendants publicly and repeatedly bragged about how their interference has so degraded WPE's services that they were causing customers, like Plaintiffs, to no longer be able to use WPE. Defendants' interference has sent shockwaves throughout the global WordPress ecosystem and has harmed hundreds of thousands customers whose websites were hosted by WPE, including Plaintiffs and the Class. In fact, Defendants have maintained a website, WP Engine Tracker, that publicly shows how many WPEngine customers have left WPEngine since Defendants started engaging in their unlawful conduct—demonstrating Defendants' knowing and intentional conduct targeted to WPEngine's customers, including Plaintiffs and Class Members.[1]

2.  Understanding the nature of the WordPress open-source software and the relationship between Plaintiffs, WPE, and Defendants is critical to evaluating the merits of this action. WordPress is a massively successful free open-source web content management system, which allows individuals and businesses to create and build their own websites. WordPress maintains at least 54,000 plugins ("Plugins"), 11,000 themes, and unlimited layout customization options, which allow website developers and operators significant freedom of choice and customization when building and operating a website.[2] WordPress is the world's most widely used

---

[1] *See* https://wordpressenginetracker.com/ (last accessed, May 23, 2025).

[2] *See* https://barn2.com/blog/wordpress-market-share . (last accessed May 23, 2025). As noted below, WordPress's own statements show they maintain at least 54,000 plugins while the foregoing article quotes a higher figure.

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

website-building software and powers more than 40% of all websites on the internet. WordPress software has long been publicly promised as free and available to all, in perpetuity.

3.     One of the reasons for the massive success of WordPress has been the WordPress community, which consists of, among others, volunteers worldwide who are constantly creating, maintaining, and updating WordPress software and fixing security issues, as well as developing and updating innumerable tools, some known as Plugins,[3] to aid website developers with building and updating numerous aspects of their websites. The WordPress plugins, themes, and software that website developers and operators rely on to build and allow their websites to continue to function are automatically updated from a central repository at the WordPress.org website. The use of the WordPress.org website as the central repository for these tens of thousands of Plugins, tools, and themes, including continuous updates of those Plugins, tools, and themes, is hard-coded into the WordPress core open-source software. In other words, when a developer uses WordPress source code, Plugins, or other tools, updates are automatically applied to those features for all users when the central repository is updated.

4.     The WordPress source code was originally owned and/or controlled by Defendant Mullenweg's for-profit company, Defendant Automattic. However, in 2010, Defendants represented that the source code would be transferred to the nonprofit WordPress Foundation (created by Mullenweg), which would ensure free and open access for all. Prior to September 2024, it was widely understood that the WordPress.org website was controlled by the non-profit WordPress Foundation. However, Mullenweg has recently claimed that the WordPress.org website is his own personal website which he can exclusively control as he sees fit.[4]

5.     Creating a website from scratch using WordPress software can be time-consuming and requires technical skill. This means that the average individual or business owner may not have

---

[3] Per WordPress, a Plugin is a package of code that extends the core functionality of WordPress. Plugins extend the functionality of a website. *See* https://developer.wordpress.org/plugins/intro/what-is-a-plugin/ (last accessed May 23, 2025). For example, a Plugin could be used to automatically display links to the top ten most recent posts on a website or allow individuals to book appointments online.

[4] According to reports, Automattic has an entire division dedicated to the wordpress.org website. It is unclear who funds wordpress.org's infrastructure.

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

the time or know-how to use, or learn how to use, WordPress software. As a result, numerous for-profit companies now offer web hosting platforms for WordPress. These companies offer tools that streamline and help manage the process of building or maintaining a website built with WordPress software for businesses and individuals who wish to create websites, such as Plaintiffs. Some of these WordPress platform-hosting companies, such as WordPress.com and Pressable, are owned or controlled by Defendants Mullenweg and Automattic, while others, such as WPE, are independent.

6.      In September 2024, Defendants initiated a self-described campaign of "nuclear war" against their competitor, WPE. Defendants elected to strike at WPE by crippling the ability for WPE customer websites, like those operated by Plaintiffs, to access the WordPress repository. The fallout from this strike would leave hundreds of thousands of WPE customer websites, who were paying WPE for WordPress hosting services, without access to core WordPress functionality.  In Defendant Mullenweg's own words: "people are paying 400 million dollars to WPEngine that promises them security, updates, hosting, et cetera. So they were selling the free stuff on WordPress.org to their customers. **And then when we turned them off, they got mad.**"[5]

7.      Mullenweg *knew* and *publicly admitted* people paid "400 million dollars to WPEngine" in exchange for contractual promises of "security, updates, hosting, et cetera." And Mullenweg explained that when "we turned them off," customers "got mad." Defendants' campaign of "nuclear war" against WPE was predicated on their understanding that WPE promised customers "security, updates, hosting, et cetera" and belief WPE's customers would have their websites disrupted when Defendants "turned off" those same contractually required services.

8.      As part of this campaign of "nuclear war," Defendants blocked WPE's access to the WordPress.org repository including software updates and patches, security updates, and Plugins starting at least as early as September 24, 2024. This action was temporarily rescinded to allow WPE to mirror certain data on the WordPress.org website on September 28, 2024, following which Defendants permanently blocked access again three days later, October 1, 2024. Plaintiffs are not

---

[5] *See* https://www.youtube.com/watch?v=f15Xn23Mytg&t=3474s (Last Accessed January 13, 2026)

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

aware of any remotely comparable event where access to the central WordPress.org repository was permanently blocked.

9.     Plaintiffs and the class have suffered harm due to their websites' inability to access the repository because Plaintiffs and the class contracted with WPE for managed WordPress web hosting services. WordPress software is hard-coded to draw exclusively upon the WordPress.org repository for auto-updates, and use of WordPress.org is crucial for the efficient and effective use of the plugins, themes, updates, and patches needed for effective website creation, development, and maintenance for websites built using WordPress software, code, and tools. Although some partial workarounds exist, they are time consuming, less secure, and require high levels of expertise to implement, which is precisely what Plaintiffs sought to avoid when they purchased WPE hosting services in the first place.

10.     Plaintiffs also use WPE hosting services to create and maintain websites for Plaintiffs' own clients. By deliberately creating and engendering uncertainty in the managed web-host marketplace and seeking to portray WPE as distressed, as well as by actively damaging and degrading WPE hosting services, Defendants undermined Plaintiffs' relationships with their existing clients, their prospective relationship with those clients, and their prospective relationship with future clients. For example, one of Plaintiff Schanzer's clients, a small newspaper, was significantly impacted by Defendants' disruption of WPE's services and Plaintiff Schanzer had to charge them only half the normal amount in an effort to recover the relationship. Plaintiff Keller also had a client who was considering purchasing additional services from him, but elected not to do so after Plaintiff Keller warned them about the WPE disruption.

11.     Defendants have no justifiable reason for interfering in the contracts between Plaintiffs and WPE, or between Plaintiffs and their clients, and indeed they are actively seeking to capitalize on the disruption they themselves caused. Both WordPress.com and Pressable, web-hosting platforms owned by Defendants which compete with WPE, have been running major advertising campaigns offering to buy out WPE customers, including advertising that their products have better "performance, security, and support." These advertising campaigns started immediately

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

after Defendants blocked WordPress.org services from WPE, which caused decreased performance of WPE customer websites, security issues due to no longer having access to the central repository, and limited the website support that WPE could offer its customers due to being cut off from the central repository. Indeed, these advertising campaigns seek to capitalize on Defendants' deliberate disruption of WPE services and remain ongoing.[6]

12.    Moreover, Defendants have utilized their position and access to WordPress core systems to, on or about November 7, 2024, publish a list of WPE customers and their websites, including websites owned by Plaintiffs.  On December 10, 2024, this Court issued an injunction ordering Defendants to take down this list of websites, including those of Plaintiffs. *See* Case No. 24-cv-06917-AMO Dkt. No. 17.

13.    Specifically, on or about November 7, 2024, Defendants published a list of at least 842,515 websites at https://wordpressenginetracker.com (operated through githhub repository at https://github.com/wordpressenginetracker/wordpressenginetracker.github.io) that used WPE for website hosting services. Defendants represented this list of websites comprised "all sites ready for a new home." On information and belief, the tracking file included all or substantially all websites that Defendants tortiously interfered with. Crucially, ***all but one of the websites operated by Plaintiffs that used WPE's services was included on this list.***[7]

14.    Defendants created and maintained this list of WPE customers, including all websites owned and operated by Plaintiffs, at least as early as September 21, 2024. Every version of the https://wordpressenginetracker.com website, including the one currently active as of January 15, 2026, included a list identifying "the number of websites that have left WPEngine and found a new home since Sep 21, 2024." Defendants described this list as "sites ready for a new home" for the purpose of identifying WPE customers so they could be targeted and poached to leave WPE. In

---

[6] *See* https://pressable.com/wpe-contract-buyout/ (last accessed May 23, 2025).

[7] Indeed this Court has already stated that at the domains.csv file is "the purported list of WPEngine customers." (Case No. 24-cv-06917-AMO Dkt. No. 64 at 41 line 18)

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

the immediate aftermath of the publication of this list, numerous customers complained online about suddenly receiving unsolicited hosting calls.[8]

15. Indeed, the customer list published by Defendant was so accurate, they identified the specific number of websites they claimed left WPE for *every day* after September 20, 2024. On information and belief, Defendants published a *daily* list showing the number of websites that left WPE each day after September 20, 2024 because they created, and were updating, their comprehensive WPE customer list at least daily at least as early as that date. As of the date of filing (January 15, 2026), Defendants continue to maintain and promulgate a list of the websites they claim have left WPE, after and likely as a result of their interference, for alternate web-hosting services day-by-day and even minute-by-minute.

16. Defendants' published list demonstrates that they had knowledge of Plaintiffs' and Class Members' websites, that those websites were hosted using WPE's services pursuant to WPE's contracts with its customers, and that Defendants sought to target these WPE customers for their own financial benefit. Defendants' poaching campaign was bolstered by its active attempts to disrupt those same customers' contracted-for services with WPE by blocking access to the Plugins, themes, and tools necessary to host their websites.

17. In addition to deliberately disrupting Plaintiffs' and class members' contracts with WPE, Defendants, and in particular Mullenweg, have made numerous public statements disparaging WPE and attempting to influence Plaintiffs and Class Member to not contract for WPE's services (and instead to contract with Defendants for their web hosting services). For example, in an October 2, 2024 X (formerly Twitter) post, Mullenweg called WPE a "distressed asset" and attempted to dissuade a potential WPE customer from contracting with WPE Exhibit 2(c). Mullenweg neglected to mention that the distress was entirely a function of Defendants' actions.

18. As a result of Defendants' deliberate tortious interference and unfair competition, Plaintiffs face an impossible situation—they must either accept a fundamentally degraded and less

---

[8] *See* e.g. the Reddit thread at:
https://www.reddit.com/r/Wordpress/comments/1grbwr4/comment/lx5a4bd/

stable service from WPE than originally agreed on and contracted for or must take considerable time, effort, and expense to migrate their websites to new web platforms. Plaintiffs and Class Members were harmed when Defendants targeted and disrupted their contracts. This instability and perceived risk of using WPE's services has decreased the value of these contracted-for services.

19.    Plaintiffs, individually and on behalf of a nationwide class, allege claims of (1) Intentional Interference with Contractual Relations (2) Intentional Interference with Prospective Economic Relations; and (3) violation of California's Unfair Competition Law (Cal. Civ. Code §§ 17200, *et seq.*).

## PARTIES

### *Plaintiffs*

20.    Plaintiff Ryan Konrad Keller is a citizen and resident of Broadview Heights, Ohio. He brings this action individually and on behalf of his company, Keller Holdings LLC, and on behalf of all others similarly situated. His small business uses WPEngine to create, maintain, and update his business website and it has been impacted by the WordPress service disruption. His business operates by creating websites for companies and individuals using WPEngine services.

21.    Plaintiff Sharon Schanzer is a citizen and resident of New York City, New York. She brings this action individual and on behalf of her company, RLDGROUP, and on behalf of all others similarly situated. Ms. Schanzer is a small business owner whose business operates by creating, maintaining, and updating the websites of her customers. All her customers' WordPress websites are built on WPEngine, and Ms. Schanzer does not build WordPress websites using other web hosting platforms because she believes WPEngine to be the best product in the marketplace.

### *Defendants*

22.    Defendant Automattic is a Delaware corporation with its principal place of business in San Francisco, California. Automattic owns and operates several for-profit businesses in the WordPress ecosystem including WordPress.com, WordPress VIP, and Pressable.com, as well as WooCommerce, Inc. (an ecommerce tool).

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

Second Amended Class Action Complaint                                                          8

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

23.     Defendant Matthew Charles Mullenweg is also the CEO and President of Automattic and purports to own a controlling share of Automattic (84%).[9] Based on his own statements, Mullenweg directs and controls the business operations of Automattic and speaks on behalf of Automattic. For example, on April 2, 2025, Mullenweg delivered a message to the employees of Automattic about a restructuring starting the message "I have had to make difficult decisions to protect Automattic's long-term future. This post will outline why the changes are happening and the next steps in our organization restructuring."[10] Mullenweg has substantial contacts in California due to being CEO and President of Automattic and the founding director of the WordPress Foundation, a California nonprofit public benefit corporation.

24.     At all relevant times, except as may be otherwise indicated, Defendants were jointly engaged in the wrongful acts alleged herein. Defendant Mullenweg was acting wrongfully on behalf of his company and in order to enrich himself, and Automattic was acting at his direction and for his benefit. Both parties jointly engaged in the wrongful acts alleged and are jointly liable.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction and diversity jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. The class contains more than 100 members (indeed, it contains at least tens of thousands of members), and many of these members, including Plaintiffs, have citizenship diverse from Defendants. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the case in controversy.

26.     The exercise of personal jurisdiction over Defendants is appropriate. Jurisdiction over Defendant Automattic is appropriate because Automattic has its principal place of business within this district, regularly conducts business in this district, and the claims at issue arise in

---

[9] *See* https://techcrunch.com/2024/10/30/matt-mullenweg-talks-about-automattics-staffing-issues-and-financials-at-techcrunch-disrupt/?guccounter=1 (last accessed May 23, 2025).

[10] Automattic, *Restructuring Announcement*, Automattic Company News, https://automattic.com/2025/04/02/restructuring-announcement/#:~:text=Earlier%20today%2C%20CEO%20Matt%20Mullenweg,and%20those%20leaving%2C%20are%20supported (last accessed May 23, 2025).

substantial part out of its activities in this district. Jurisdiction over Defendant Mullenweg is appropriate because he is the CEO and President of Automattic, which is based in this District.

27.    Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), and 1391(c)(1) and (2) because Defendant Automattic resides in this district and Defendant Mullenweg has substantial and routine relevant contacts in this district.

28.    Divisional Assignment: This action arises in the City and County of San Francisco, in that a substantial part of the events that give rise to the claims asserted herein occurred in the City and County of San Francisco, where Defendants reside. Pursuant to L.R. 3-2(d), all civil actions that arise in San Francisco shall be assigned to the San Francisco or Oakland Division.

### FACTUAL ALLEGATIONS

### I.    Background – The WordPress Ecosystem

29.    WordPress is a major pillar of the internet and is the single largest website building software. Its open-source free software is at the core of millions of websites worldwide.

30.    The WordPress open-source code is theoretically administered by the WordPress Foundation. The Foundation is a nonprofit organization charged with maintaining the WordPress code and ecosystem. According to its website, "[t]he point of the foundation is to ensure free access, in perpetuity, to the software projects we support."[11]

31.    Due to its promise of free access for everyone in perpetuity and opensource ideals and transparency, WordPress has exploded in popularity. Since its founding in 2010, it has grown to power. By its own estimates, more than 40% of all websites in the world use WordPress.

32.    The software operates on a modular architecture comprising three primary components: the core WordPress software, themes that govern the visual appearance, and plugins that add functionality, including contact forms, shopping carts, security features, and search engine optimization. When a business purchases managed WordPress hosting services, such as those offered by WPE, they are purchasing not merely server space, but access to an integrated ecosystem that depends on continuous communication with WordPress.org for updates, security patches, and

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

---

[11] https://wordpressfoundation.org/ (last accessed May 23, 2025).

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

new functionality. (*WPE SAC* ¶¶ 36-38; WordPress Developer Documentation, https://developer.wordpress.org/.) One of the greatest attractions of WordPress is this "ecosystem." Because WordPress is free and open source, it has attracted innumerable programmers and engineers who combine efforts to improve or utilize the service. As a result, WordPress boasts that it has over 54,000 freely available Plugins available for use in its repository.[12]

33. Examination of the WordPress source code repository (github.com/WordPress/wordpress-develop) reveals that the WordPress software contains at least 15 distinct hardcoded API endpoints pointing to api.wordpress.org and related subdomains. These references are not configurable settings that a hosting provider or website owner can modify; they are permanent URLs embedded as string literals in the PHP source code. For example, in the file wp-includes/update.php, the function wp_update_plugins() contains the following hardcoded endpoint:

```
$url = 'https://api.wordpress.org/plugins/update-check/1.1/';
```

Similarly, the function *wp_version_check()* in the same file contains:

```
$url = 'https://api.wordpress.org/core/version-check/1.7/?' .
http_build_query( $query, '', '&' );
```

34. There is no configuration file, database setting, or filter hook that allows site administrators or hosting providers to redirect these API calls to alternative servers. When Defendants blocked WPE's access to WordPress.org, they simultaneously severed these hardcoded communication pathways for every WPE customer. (WordPress Core Source Code, wp-includes/update.php; WordPress Developer Reference, https://developer.wordpress.org/reference/functions/wp_update_plugins/.)

35. The WordPress core software includes explicit error messaging that confirms the software was designed with the expectation that WordPress.org would always be accessible. The source code in wp-includes/update.php contains the following error messages that appear when WordPress.org cannot be reached:

---

[12] https://wordpressfoundation.org/projects/ (last accessed May 23, 2025).

Second Amended Class Action Complaint                                                                11

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

__( 'An unexpected error occurred. Something may be wrong with WordPress.org or this server's configuration. If you continue to have problems, please try the support forums.' )

__( '(WordPress could not establish a secure connection to WordPress.org. Please contact your server administrator.)' )

36.    These error messages appear in multiple core functions including *wp_version_check()*, *wp_update_plugins()*, *wp_update_themes()*, and *plugins_api()*. The existence of these messages demonstrates that WordPress developers did not anticipate a scenario in which a hosting provider's entire customer base would be deliberately denied access to WordPress.org. WPE customers who encountered these error messages during the blocking period were experiencing the direct technical consequences of Defendants' actions. (WordPress Core Source Code, wp-includes/update.php.)

37.    Due to the huge number of available Plugins and themes in the WordPress repository, websites operated using WordPress Plugins and code are highly customizable with various tools that serve different purposes depending on individual needs. Free access to these tens of thousands of tools is a major element of the attraction of WordPress software and a major element of its staying power. Moreover, Plugins and themes not only enable enhanced website functionality and capacity, but they are also essential for website administration, security, and updates.

38.    The WordPress source code and repository is stored on the WordPress.org website. Plugins are stored, categorized, and reviewed in the repository, and the core WordPress software includes more than 1,500 callbacks to the WordPress.org website for functionality, updates, and patches. Access to WordPress.org is essential for the use of WordPress software and the efficient and effective use of the Plugins, updates, and patches needed for effective website creation and development in the WordPress ecosystem.

39.    For years it was widely understood that WordPress.org was controlled by the WordPress Foundation. However, Mullenweg recently revealed that he controls WordPress.org as his own personal website.[13] This alarmed many WordPress contributors who believed they were

---

[13] *See* https://www.theverge.com/2024/10/4/24262232/matt-mullenweg-wordpress-org-wp-engine (last accessed May 23, 2025).

aiding the non-profit WordPress Foundation, not donating substantial time, effort, and resources to Mullenweg's personal website.

40.      Defendant Matt Mullenweg was a founder of WordPress and created the WordPress foundation in 2010. Mullenweg split the nonprofit WordPress Foundation from his for-profit company, Automattic.

41.      Although Mullenweg claimed to have given the WordPress trademark to the WordPress Foundation, he now purports to have retained for himself and Automattic exclusive, irrevocable, and perpetual rights to the WordPress commercial trademark. He also apparently claims to have reserved personal individual control over the WordPress.org website (including the vital repository), for himself.

42.      Creating a website from scratch, as well as continually maintaining and updating it, can be difficult. As a result, a number of companies offer "managed website hosting" where they will create a website framework and management structure that makes it easier for developers and customers to create, control, and maintain websites within a particular web-ecosystem.

43.      WPE is a managed website-hosting company that hosts and assists customers in managing websites utilizing WordPress software, including its Plugins and themes, updates, and support. In this respect it is a direct competitor to Mullenweg and Automattic, who own competing managed website hosting services such as WordPress.com, and Pressable. WPE has grown significantly in the past several years and has a substantial customer base. WPE's customer base ranges from small businesses and individuals to major companies such as Yelp, Thompson-Reuters, and Dropbox.

44.      Plaintiffs are in the business of creating websites for paying customers. Plaintiffs are long-time WPE customers who have used WPE for more than a decade to manage and build websites for their clients. Plaintiffs have agreements with WPE and pay money for WPE services that depend on WordPress.org to function. And Plaintiffs both use WPE for their own business websites. Prior to September 2024, Plaintiffs had no complaints about WPE and intended to continue to use WPE for the indefinite future.

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

**II.    The Dispute Between Automattic and WPEngine**

45.    Starting on or around September 20, 2024, Defendants initiated a highly public and vocal dispute with WPE. While Defendants claim the origin of the conflict lies in a trademark dispute concerning whether the name "WPEngine" violates the WordPress commercial trademark owned by Automattic, WPE contends that Defendants' actions were a poorly disguised attempt to extort WPE out of tens of millions of dollars against the threat of making it virtually impossible for WPE (and its customers) to conduct its ordinary business.

46.    The dispute first became public when Mullenweg publicly excoriated WPE at a WordPress keynote address on September 20, 2024 (as he had promised to do in threatening texts to WPE employees and officers).[14] At least as early as September 20, 2024, Defendants accessed what they would later represent to be a full customer list identifying every website, including Plaintiffs' websites, that were hosted by WPE.

47.    On September 23, 2024, WPE sent a cease-and-desist letter to Automattic. Automattic and Mullenweg almost immediately blocked WPE from accessing critical WordPress.org resources (on September 24, 2024) including blocking critical access to the repository needed for functional and updated themes and plugins. Plaintiffs are unaware of any other instance when WordPress blocked a major webhost from accessing its resources, which they had long promised would be free and available to everyone forever. This effort targeted and specifically blocked existing WPEngine websites, like those of Plaintiffs, from operating with their expected functionality.

48.    As planned and intended, Defendants' actions had an immediate and severe impact on WPE customers. These customers, including Plaintiffs and the class, were unable to install or update Plugins or themes and had more limited administrative access to the websites they operated (for example, they could not update the Plugins, themes, and in some cases the content of the website), as well as limited access to software updates, editing tools, and access control because

---

[14] *See* https://www.therepository.email/mullenweg-threatens-corporate-takeover-of-wp-engine (last accessed May 23, 2025).

these features were all tied to the WordPress central repository.[15] This not only crippled website owners' ability to control and modify their websites in a managed environment, as they had paid WPE for, but also created a significant security risk, as security vulnerabilities may not be left unpatched.

49.     WPE customers, including Plaintiffs, suffered from substantially degraded website performance for several days. All WPE customers, including Plaintiffs, are party to a Service Level Agreement (SLA) which promises a certain level of website uptime, generally 99.95% of the time with certain exclusions for maintenance. The multiple days of severely degraded services substantially exceeded the permissible SLA allowed by contract.

50.     Almost immediately after Defendants blocked WPEngine, Defendants' companies, such as Pressable, began an advertising campaign aimed at stoking customer backlash in an attempt to convince customers to break their contracts with WPE.

51.     Defendants temporarily lifted the ban on WPEngine for three days (between September 27 and 30), to allow WP Engine to make a mirror of some of the WordPress plugins and code, but they quickly shut off access again on October 1, 2024.

52.     While WPE was able to mirror many parts of the original WordPress.org system based on information gathered in those three days, the mirrored servers could not provide service equivalent to the standard that existed prior to September 24, 2024. The hard-coded references to WordPress.org in core WordPress code and lack of access to the automatically updated Plugins repository, for example, meant the work-around was both difficult to implement and provided degraded services compared with the originally contracted services.

53.     While Defendants claim that their decision to block access by Plaintiffs and Class Members was a typical cessation of business relationships during ongoing litigation, it was anything but. WPE has produced voluminous evidence that the so-called trademark dispute is a mere pretext

---

[15] Websites typically have two components, a "frontend" and "backend". The frontend is what users accessing a website see, such as the visual elements like buttons, checkboxes, graphics, and text messages. The backend is the data and infrastructure that make the website function. It includes the source code for the website, and relevant here, Plugins.

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

to sabotage WPE's services and relationship with its customers. This evidence includes, but is not limited to, numerous text messages from Mullenweg threatening WPE if it refused to pay at least 8% of their revenue to Automattic, Mullenweg's for-profit company, including threatening a "nuclear war" if his demands were not met; statements from Mullenweg indicating the fees he sought were based on what he thought WPE could afford, rather than what the value of the trademark actually was; WPE's own longstanding use of the "WP" nomenclature, which was expressly permitted on the WordPress foundation website; and engaging in unprecedented and malicious conduct unrelated to the trademark dispute, such as seizing control of the popular ACF (Alternate Custom Fields) Plugin.[16]

54.     In any event, Defendants' actions knowingly and intentionally caused harm to Plaintiffs and Class Members. Between September 24-27, 2024, and again between October 1, 2024 and December 10, 2024 (when the District Court enjoined Defendants' actions), Defendants engaged in a sustained and deliberate campaign to disrupt and inhibit the relationship between WPE and its customers and to specifically disrupt the websites of the WPEngine customers that it identified and targeted. In addition to the crippling decision to shut down access to the core WordPress architecture (software expressly promised to be always free and available to everyone), Defendants:

- added a checkbox to the WordPress.org website requiring someone to attest they were unaffiliated with WPEngine before they could access its resources;

- stole WPE's most popular plugin and renamed the author to give themselves credit for the product, repeatedly alluding that worse was to come for WPE and the increased risk that this product would be unstable (and specifically that Defendants would ensure it was less usable);

---

[16] Among other things, Mullenweg seized control over the popular ACF plugin relating to a purported security vulnerability. This has never been done for a major plugin before (ACF had more than 2 million downloads). Mullenweg/Automattic also changed the name of the plugin and changed the authorship from WPE to WordPress.org (Mullenweg's personal website).

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

- sent emails to WPE customers attempting to poach them by claiming they could restore access to the website if the WPE customer left WPE;

- created a website showing the entire WPE customer base designed to induce customers to leave WPE, which also created a security risk for WPE customers listed; and

- made public statements and threats towards WPE and its customers.

55. Defendants have made no secret that their *intent* is to induce Plaintiffs and Class Members to leave WPE by degrading the services WPE provides to its paying customers. When Defendant Mullenweg was asked about WPE customers who were harmed because "all of those millions of websites that depend, that are still running on WPEngine because they cannot get updates," Mullenweg responded:

> "Who pays any dollars to WordPress.org? [to the audience] No hands, right? There's nothing to pay for, it's all free. But people are paying 400 million dollars to WPEngine that promises them security, updates, hosting, et cetera. So they were selling the free stuff on WordPress.org to their customers. And then when we turned them off, they got mad."[17]

56. As Mullenweg himself acknowledged, customers, including Plaintiffs and Class Members, were paying WPE $400 million to manage the "free stuff" from WordPress.org including contractual promises of "security, updates, hosting, et. cetera." By Mullenweg's own admission, he turned off the services that WPE was selling to its customers, deliberately targeting and inhibiting the services and contracts between WPE and Plaintiffs and Class Members.

57. Mullenweg's statements in that interview are far from the only statements he has made demonstrating his intention to disrupt the websites of existing WPEngine customers like Plaintiffs. As this Court held in its order enjoining Defendants' unlawful conduct: "Defendants' conduct is designed to induce breach or disruption. That is made explicit in at least the following posts and texts which state, in part:

- 'I know that this is the nuclear option, it sets us down a specific path.' Ex. 2(a).

---

[17] https://www.youtube.com/watch?v=f15Xn23Mytg&t=3474s (last accessed May 23, 2025).

- 'If you're saying 'next week' that's saying 'no,' so I will proceed with the scorched earth nuclear approach to [WPEngine].' *Id.*

- 'I don't think they're worth a fraction of that now. Customers are leaving in droves. . . . It's a distressed asset.' Jenkins Decl. Ex. 2(c).

- "I suspect there are going to be millions of sites moving away from [the ACF Plugin] in the coming weeks." Ex. 2(d).

- "Hmm, I guess you'll have to wait and see why people might not trust ACF as much going forward." Brunner Decl. Ex. 2(b)

58.    The harm Defendants inflicted on Plaintiffs and their websites is not merely incidental—the *mechanism* Defendants used to target their business competitor WPE was to harm, degrade, and disrupt the websites of anyone who used WPE's services.

59.    Defendants intentionally disrupted WPE's services, and then capitalized on this disruption by marketing directly to WPE's customers. Defendants conducted deliberate, targeted outreach to dozens of WPE customers, beginning during or before the time that Defendants' deliberate interference with WPE's services began.

60.    Defendants have produced dozens of support tickets from its Customer Relationship Management Software, Zendesk, revealing that sales representatives began contacting numerous WPE customers as soon as October 1, 2024, immediately after the disruptions to WPE began.

61.    . Ex. 1 at 88.

62.    The ticket also reveals that Defendants had internal discussions about trying to poach WPE customers right as the disruptions began. The ticket includes internal customer service notes which contain a link to the following private webpage: https://to51.wordpress.com/2024/09/26/reaching-out-to-team-51-partners-on-wp-engine/#comment-37574. *Id.* at 89. While Plaintiffs do not have access to the contents of this webpage at this time, the title of the webpage indicates that there was a premeditated plan to reach

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

out to the WPEngine customers whose service Defendants had themselves disrupted. This plan, in effect no later than September 26, 2024, coincided with Automattic's disruption of WPEngine.

63.    During the month of October 2024 and into November, while Defendants were disrupting WPE's service, Automattic sales agents made dozens of attempts to contact WPEngine customers.

65.    Defendants went so far as to monitor outages impacting websites hosted by WPEngine, and use those outages—which were caused by Defendants' tortious conduct in the first instance—to solicit WPE customers to transition away from WPEngine:



66.    Additionally, Defendants published advertisements promising contract buyouts for businesses that switched from WPE to Defendants own companies, promising "100% uptime" and telling them to "Switch to Hosting That Puts Your Business First." Defendants knew about the

---

[18] https://support.zendesk.com/hc/en-us/articles/4408888664474-About-tags#:~:text=Tags%20are%20versatile%20tools%20that,tags%20to%20users%20and%20organizations (last accessed January 15, 2026).

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

contracts with Plaintiffs and the class; it would make no sense for them to be offering a contract buyout in the absence of knowledge of the contract. And by advertising that their competing service would be one that "puts your business first" Defendants implicitly acknowledged that their actions were harming the business interests of WPE customers. Ex. 2(e) at 1 (Screenshot below).



67.    Even if Defendants' trademark case had merit (it likely does not), it does not excuse Defendants' deliberate and vindictive targeting of Plaintiffs and the Class's websites and web-hosting contracts with WPE. Defendants' actions caused irreparable harm to WPEngine, Plaintiffs, and the putative class. Moreover, Defendants' deliberate withholding of open-source software pending a demand for tens of millions of dollars to be paid to their for-profit enterprise poses a grave danger to WordPress's entire open-source ecosystem built on the free exchange and access to information. Mullenweg profited greatly from the growth of open-source WordPress through his ownership of Automattic and WordPress.com. Withholding access to this open-source software pending personal payment to him and entities he controls is a betrayal of open-source principles and harms not just Plaintiffs, Class Members, and WPEngine, but indeed the entire internet as a whole.

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

### III.    Plaintiffs' Experiences

**Plaintiff Keller's Experiences**

68.    Defendants' interference significantly impacted the business of Plaintiff Keller. While Plaintiff Keller was happy with WPE services and intended to continue using WPE services, the service disruption and degraded service, coupled with repeated public statements and threats made by Defendants, led Plaintiff Keller to explore moving his website and all those operated by his business to another managed web host. In fact, Plaintiff Keller purchased web hosting services from Nexcess and paid $1,640.00 for alternate services due to the likelihood that he would have to move his clients from the WPEngine platform because of the service disruption.

69.    Plaintiff Keller's livelihood revolves around building and operating websites, and significant disruptions will impact his business including his own capacity to fulfill his contractual obligations to his own clients.

70.    Plaintiff Keller's websites were significantly impacted by outages despite WPE's attempts to create workarounds.

71.    Plaintiff Keller had to spend significant time and expense responding to the service disruptions and degradations, preparing for moving his and his clients' websites to a new host, and in investigating a new host environment after a long and successful prior partnership with WPE. He is not alone in the harm he has suffered.

72.    Plaintiff Keller's own website he uses for his business was also significantly impacted. Access to the WordPress backend was available intermittently, and Plaintiff Keller received emails related to this downtime.

73.    Plaintiff Keller pays WPE $3,300 per year for its "Scale Plan," 2 additional websites, and GeoTargeting and Multi-Site services. His plan expressly promises three categories of service that require continuous access to WordPress.org: (i) automated WordPress and PHP updates, described as "effortless site management"; (ii) security patching and plugin risk scans; and (iii) fully managed WP, PHP, and MySQL updates. Each of these promised services depends on WPE's servers executing the WordPress function wp_update_plugins(), which queries the endpoint

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

https://api.wordpress.org/plugins/update-check/1.1/ to identify available updates. When Defendants blocked WPE's IP address ranges from accessing this endpoint between September 24, 2024, and December 10, 2024 (a period of 77 days) these automated services could not function as promised because the underlying API calls returned connection errors instead of updated information. (WPE Scale Plan Terms of Service; WordPress Developer Reference, https://developer.wordpress.org/reference/functions/wp_update_plugins/.)

74.    The technical operation of these services requires WPE's systems to execute the WordPress function wp_update_themes(), which contains the hardcoded endpoint:

$url = 'https://api.wordpress.org/themes/update-check/1.1/';

75.    When this function executes, it transmits a list of installed themes to WordPress.org and receives information about available updates. When Defendants blocked this communication, the Premium 1 Plan's "automatic WordPress & PHP updates" feature ceased to function, not because WPE failed to perform its obligations, but because Defendants deliberately severed the technical pathway that enables such updates. WPE's servers were still attempting to execute these functions; they simply received connection refused errors from Defendants' servers. (WordPress Core Source Code, wp-includes/update.php, function wp_update_themes().)

76.    Due to Defendants' actions, Plaintiff Keller was unable to update his website in the way he paid for when he purchased the Scale Plan. Among other things, the Scale Plan promises purchasers: (i) automated WordPress & PHP updates and "[e]ffortless site management with daily backups, one-click staging, automatic WordPress & PHP updates, and simple-to-use portal," (ii) security patching and plugin risk scans, and (iii) fully managed WP, PHP & MySQL updates.[19]

---

[19] See WPEngine, *WordPress Hosting by WP Engine*, WPEngine, https://wpengine.com/wordpress-hosting-ppc-pm/?utm_campaign=GS_NB_NAMER_US_Hosting&utm_source=google&utm_medium=cpc&utm_content=Hosting_Generic&utm_term=dedicated%20server%20hosting&utm_target=aud-338717939405:kwd-10248710&gad_source=1&gad_campaignid=20531032754&gbraid=0AAAAADmqYaRSwG0Lfa4lD-cc9MjRhd61u&gclid=Cj0KCQjwxJvBBhDuARIsAGUgNfhsg58cwbAVRiTPUfoo67a3CeaQ9rvyMyZybdL8C95hPNSFQNTqG6IaAkHtEALw_wcB#plans (last accessed May 23, 2026).

Because Defendants disrupted WPEngine's access to the WordPress repository, instead of receiving the benefits of the Scale plan from WPEngine, Plaintiff Keller had to perform all of the promised benefits of his Scale plan himself, which took significant time and expense. In short, Plaintiff Keller did not receive the benefit of his bargain with WPE because of Defendants' actions.

77.    During the course of the disruption (prior to the December 10 injunction), Plaintiff Keller maintained significant concerns that the inability to update Plugins and the intermittent disruptions to the website backend could create a security vulnerability that would damage his website, in addition to potentially harming those of his customers and his professional reputation.

78.    If the district court had not issued its December 10 preliminary injunction, Plaintiff Keller would have had no choice but to move his websites away from WPEngine. Indeed, if the preliminary injunctive relief is not made permanent, Plaintiff Keller would move his services away from WPE to another web host, and already spent money to purchase additional web hosting services for his client's websites in the event that a migration is necessary.

79.    Moving to another managed web host would require significant financial investment and risk. If he were forced to change hosts, there is a good possibility that functions on the 20 or so websites operated by Plaintiff Keller, as well as Plaintiff Keller's own website, would break or that there would be additional downtime. There would be a serious risk that this could cause him to lose clients, and it would take major resources, including hours spent and money invested, to attempt to mitigate the risk of harm.

80.    All of Plaintiff Keller's clients' websites appeared on the domains.csv file published by Defendants; as did Keller's personal business website. Plaintiff Keller's personal business website (securesight.co) is website entry number 541,261 on the "domains.csv" list published by Defendants.

81.    One of Plaintiff Keller's clients was considering adding a new website, but declined to do so after Plaintiff Keller advised the clients about the risk of problems caused by the WPE dispute and service disruption.

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

**Plaintiff Schanzer's Experiences:**

82.     Defendants' interference also significantly impacted the business of Plaintiff Schanzer. While Plaintiff Schanzer was happy with WPE services and intended to continue using WPE services, the service disruption and degraded service, coupled with repeated public statements and threats made by Defendants, caused Plaintiff Schanzer to start exploring other options for web hosting services for her clients.

83.     Plaintiff Schanzer's livelihood revolves around building and operating websites, and the significant disruptions caused by Defendants impacted her existing and future business. Plaintiff Schanzer exclusively uses WPE for her business and exclusively recommended its use with her clients. Disruptions to WPE services will always adversely impact her existing and prospective business relationships.

84.     Defendants' disruption of WPE services significantly impacted Plaintiff Schanzer's business. One of her clients, a small local newspaper which necessarily needs to be able to quickly update the website to publish new stories, was so badly impacted by the disruption that Plaintiff Schanzer had to provide a 50% discount to the client due to Defendants' interference. Plaintiff Schanzer also paid for a premium theme and support for that theme from a third party (not WPE), but the theme was not functioning as designed due to Defendants' disruption, and it took her time and resources to work around the problem.

85.     The websites Plaintiff Schanzer manages and provides web hosting services for were significantly impacted by outages despite WPE's attempts to create workarounds.

86.     Plaintiff Schanzer had to spend significant time and expense responding to the service disruption and degradations, potentially preparing to move her client's websites to a new host, and investigating comparable web hosting services.

87.     Plaintiff Schanzer pays WPE $762.13 per month ($9,145.56 yearly) for her Premium 1 Plan. Due to Defendants' actions, Plaintiff Schanzer was unable to manage her client's websites in the way she expected when she paid for the Premium 1 Plan. Among other things, the Premium 1 Plan promises purchasers: (i) automated WordPress & PHP updates and "[e]ffortless site

management with daily backups, one-click staging, automatic WordPress & PHP updates, and simple-to-use portal," (ii) security patching and plugin risk scans, and (iii) fully managed WP, PHP & MySQL updates as well as access to themes. Her plan expressly promises three categories of service that require continuous access to WordPress.org: (i) automated WordPress and PHP updates, described as "effortless site management"; (ii) security patching and plugin risk scans; and (iii) fully managed WP, PHP, and MySQL updates. Each of these promised services depends on WPE's servers executing the WordPress function wp_update_plugins(), which queries the endpoint https://api.wordpress.org/plugins/update-check/1.1/ to identify available updates. When Defendants blocked WPE's IP address ranges from accessing this endpoint between September 24, 2024, and December 10, 2024 (a period of 77 days) these automated services could not function as promised because the underlying API calls returned connection errors instead of updated information. (WPE Scale Plan Terms of Service; WordPress Developer Reference, https://developer.wordpress.org/reference/functions/wp_update_plugins/.)

88.    The technical operation of these services requires WPE's systems to execute the WordPress function wp_update_themes(), which contains the hardcoded endpoint:

$url = 'https://api.wordpress.org/themes/update-check/1.1/';

89.    When this function executes, it transmits a list of installed themes to WordPress.org and receives information about available updates. When Defendants blocked this communication, the Premium 1 Plan's "automatic WordPress & PHP updates" feature ceased to function, not because WPE failed to perform its obligations, but because Defendants deliberately severed the technical pathway that enables such updates. WPE's servers were still attempting to execute these functions; they simply received connection refused errors from Defendants' servers. (WordPress Core Source Code, wp-includes/update.php, function wp_update_themes().)

90.    Because Defendants disrupted WPEngine's access to the WordPress repository, instead of receiving the benefits of the Premium 1 Plan from WPEngine, Plaintiff Schanzer had to perform all of the promised benefits of her Premium 1 Plan herself, which took significant time and

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

expense. In short, Plaintiff Schanzer did not receive the benefit of her bargain with WPE because of Defendants' actions.

91.    If the district court had not issued its December 10 preliminary injunction, Plaintiff Schanzer would have had no choice but to move her clients' websites away from WPEngine at very significant expense.

92.    Plaintiff Schanzer exclusively uses WPE with her clients and always recommends it whenever a prospective client inquires about her building a website for them. Defendants' disruption of access to the WordPress repository impacted her ability to recruit new prospective clients.

93.    To the extent that there may be technical workarounds to mitigate the harm caused by Defendants' deliberate disruption and denial of services, this entirely misunderstands the purpose of website management systems like WPEngine. Customers, like Plaintiffs, purchase managed web-hosting services from providers such as WPE in order to *avoid* having to spend significant time and effort working on manual updates and complex and difficult backend website construction, maintenance, updates, and modification. Plaintiffs and Class Members paid for the tools to make website construction, operation, and function efficient and effective. A workaround that requires as much or more work than operating the website without the managed web host to begin with is not an effective mitigation of harm; it is a breach of the fundamental purpose of the contract.

**Defendants' Specific Degradations of Plaintiffs' Services with WPEngine**

94.    Additionally, the "security patching and plugin risk scans" promised in Plaintiffs' contracts specifically depend on access to WordPress.org's vulnerability database and patch distribution system.  In 2024 alone, security researchers documented 7,966 new vulnerabilities in the WordPress ecosystem (an average of 22 per day), with 96% affecting plugins, 4% affecting themes, and seven affecting WordPress core. (Patchstack, "State of WordPress Security In 2025," March 2025.) Of these, 30% were assessed as having a significant risk of real-world exploitation. When a critical vulnerability is discovered, such as the September 2020 File Manager plugin

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

vulnerability that affected over 600,000 WordPress sites, plugin developers release patches through the WordPress.org repository. The WordPress function plugins_api(), located in wp-admin/includes/plugin-install.php, retrieves this security information from:

```
$url = 'https://api.wordpress.org/plugins/info/1.2/';
```

95.    By blocking WPE's access to this endpoint, Defendants prevented Plaintiffs' websites from even knowing that security patches existed, let alone downloading and installing them. This created a quantifiable security exposure during a 77-day window that is demonstrably inconsistent with the "security patching" services Plaintiffs purchased. (Patchstack Security Reports, 2024; WordPress Core Source Code, wp-admin/includes/plugin-install.php; WPE SLA Documentation.)

96.    The promised "daily backups" included in both the Scale Plan and Premium 1 Plan rely on WordPress's backup infrastructure, which coordinates with WordPress.org to ensure backup integrity and compatibility with current WordPress versions. The WordPress function get_core_checksums() verifies file integrity by comparing local files against known-good checksums retrieved from:

```
$http_url = 'http://api.wordpress.org/core/checksums/1.0/?' .
http_build_query( compact( 'version', 'locale' ), '', '&' );
```

97.    During the blocking period, Plaintiffs' websites experienced intermittent access to the WordPress administrative backend, the control panel where website owners manage content, update plugins, and monitor site performance. Plaintiffs received system-generated emails from WPE's monitoring systems documenting these outages. These were not theoretical concerns; they were contemporaneous automated notifications confirming that Defendants' actions had disrupted the promised services. When WPE's systems attempted to verify file integrity or check for available updates, the requests failed because Defendants had blocked the connection. (WordPress Core Source Code, wp-admin/includes/update.php, function get_core_checksums().)

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

98.     Moreover, The WordPress administrative dashboard that Plaintiffs use to manage their websites includes a "Site Health" feature that assesses the security and performance of a WordPress installation. This feature depends on multiple WordPress.org API endpoints, including:

• https://api.wordpress.org/core/serve-happy/1.0/ (PHP version security check)

• https://api.wordpress.org/core/stable-check/1.0/ (WordPress version status)

• https://api.wordpress.org/core/checksums/1.0/ (file integrity verification)

99.     During the blocking period, these Site Health checks returned errors or incomplete information, thereby preventing Plaintiffs from accurately assessing the security status of their websites. The WordPress dashboard indicates that it cannot connect to WordPress.org to verify whether the installed software versions are current and secure. This is precisely the "site management" functionality that Plaintiffs' WPE contracts promised to deliver "effortlessly." (WordPress Developer Reference, Site Health Feature Documentation.)

100.     As Defendants have repeatedly stated, they anticipate many more people will be compelled to leave WPEngine as a result of their self-described campaign of "scorched earth nuclear war" against WPE. In Defendants' self-proclaimed war, hurting innocent class members is not by accident; it is the intended result. Even customers who have stayed with WPE nevertheless suffered months of significantly degraded service worth far less than they paid for because of Defendants' deliberate attempt to leverage their power and control over the WordPress ecosystem to cripple a competitor (and its customers) and redirect Plaintiffs and Class Members to Defendants' own for-profit businesses.

## IV.     Defendants Knowledge of Plaintiffs' Contracts

101.     At the time Defendants interfered with Plaintiffs' contracts, Defendants had specific knowledge WPE had been contracted to host Plaintiffs' websites. Defendants published a list of WPE customer websites at the web address https://wordpressenginetracker.com at least as early as November 6, 2024. The website directed users to a list entitled "domains.csv" csv) which contained approximately 842,514 entries. The technical sophistication required to compile this list demonstrates that Defendants had access to and utilized data identifying specific WPE customers;

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

this was not generalized awareness that WPE had customers, but specific identifying information about which domains were hosted on WPE's infrastructure.

102.    WordPress.org's technical architecture necessarily provided Defendants with visibility into which websites were hosted on WPE servers. When any WordPress installation communicates with WordPress.org's API endpoints, the WordPress code transmits detailed information about the installation, including the WordPress version, PHP version, server locale, number of active plugins, and other identifying characteristics. The *wp_version_check()* function transmits this data to api.wordpress.org. Defendants could identify WPE-hosted installations by IP address ranges, server signatures, or hosting-environment fingerprints contained in these API requests. The blocking mechanism itself demonstrates this knowledge. Defendants had to identify WPE traffic to block it. (WordPress Core Source Code, wp-includes/update.php; WPE SAC ¶¶ 159-165.)

103.    At the time Defendants initiated their service disruption, Plaintiff Schanzer operated at least 49 websites through her business RLDGROUP. Every single website she owned or operated appeared on the domains.csv file. Likewise Plaintiff Keller operated 19 websites at the time the disruption occurred, 18 of which appeared on the domains.csv file

104.    Every website owned or operated by Plaintiffs, except one, appears on this list that Defendants themselves created of WPE customers.

105.    Defendants themselves represented publicly that this list represented *every* domain hosted by WPEngine *and* that "you can see decline every day" for *each* day since September 21, 2024.[20]

---

[20]  The post, made by Defendant Mullenweg through the @WordPress handle he controls, can be viewed directly at: https://x.com/WordPress/status/1854271844309684285 (Last Accessed January 9, 2026)

106.    That Defendants had compiled a list of WPE customers and were tracking departures *daily* for each day on or after September 21, 2024 further corroborated by the website itself. The website "wordpressenginetracker.com," both currently and when it first came online on November 6, 2024, expressly states that it is tracking "the number of websites that have left WP Engine." The September 21, 2024 start date was not chosen by chance—it is how Defendants elected to track the casualties they inflicted in their campaign of "nuclear war."



*See*: https://x.com/WordPress/status/1854271844309684285 (last accessed January 15, 2026)



Screen capture from wordpressenginetracker.com as of January 15, 2026:

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220



This is the number of websites that have left WP Engine and **found a new home** since Sep 21, 2024.

Search below to see if a site is still hosted by WP Engine

example.com  🔍

Enter a domain name

Download a CSV of all sites ready for a new home

⬇ Download (16MB)

Screen capture from the Internet Archive dated November 6, 2024

107.    In each version of the tracking website, Defendants were unambiguous that they were tracking each WPE customer website, including Plaintiffs' websites, that they deemed "ready for a new home." Defendants were doing more than just tracking the raw number of websites hosted by WPE, they were tracking *each* website specifically and were providing or withholding access to resources based on whether the website used WPE as their website host. Indeed, Defendants continue to publish a daily "activity log" identifying the specific WPE customer websites that have changed web hosts each day. That log is, according to Defendants, is accurate down to the minute. Screen capture showing the modern tracking website (capture taken January 15, 2026) is below:

**Activity Log Today**

| Site | Destination |
|------|-------------|
| stackwizard.com ↗<br>2hrs, 55mins ago | 🔲 Bluehost |
| lilerealestate.com ↗<br>2hrs, 57mins ago | 🟥 Kinsta |
| kresk4oceans.com ↗<br>3hrs, 16mins ago | ✔ OVH |
| classicroofers.com ↗<br>3hrs, 37mins ago | 🟥 Kinsta |
| growwithelite.com ↗<br>3hrs, 55mins ago | ⋈ Hostinger |

108.    Defendants published what they themselves described as a customer list, publicly identifying *every* website operated or controlled by Plaintiffs. They described Plaintiffs' websites

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

as needing a "new home." Defendants themselves represented they had been tracking WPE customers since at least as early as September 21, 2024 on an individual basis. Critically, Defendants would not have published Plaintiffs' websites on their own WPE customer list if they did not believe that Plaintiffs were WPE customers.

109.    Defendants understood that the website developer designing the website at each web address they published on the tracking site had contracted with WPE for web hosting services. In other words, Defendants understood there was a valid contractual relationship between the owners of the websites they published and WPE for website hosting services. It is precisely the provision of these services that Defendants sought to disrupt through their interference with WPE's contracts with its customer.

110.    In a wave of targeted outreach, Defendants openly tried to poach the WPE customers with the most to offer them, knowing that all WPE customers would suffer as a result. Defendants knew that Plaintiffs would be collateral damage of their tortious plan to pressure certain WPE customers to migrate to Automattic by deliberately inflicting economic harm on each and every WPE customer.

111.    Defendants' decision to release the WPE customer list online was widely condemned online. Publishing this list revealed extensive information about the themes, plugins, and other important data on WPE customers including on websites that were set to "noindex" (meaning they were not intended to be indexed or publicly accessible). Defendants' publication of the customer list exposed WPE clients to "doxxing." Moreover, according to one analyst, the list Defendants published appears to include "thousands of domains that no longer use WordPress" which "suggests that Matt Mullenweg may have been compiling this data for years, retaining information about domains that potentially stopped using WordPress long ago."[21]

112.    Defendants conducted outreach to numerous WPE customers in the immediate aftermath of the disruption that Defendants caused, demonstrating that Defendants knew exactly who WPE's customers were at the time of the disruption. ██████████████████

[21] https://www.ilovewp.com/wpengine-automattic-data-leak-matt-mullenweg/ (Last Accessed January 13, 2026)

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

███████████████████████████████████████████

███████████████████████████. *See generally* Ex. 1.  As a result, Defendants interfered

with and disrupted the provision of those contractual services to class member websites.

Automattic could not have attempted to target and poach WPE's customers if it was not aware of

the identities of WPE's customers.

113.    Defendants intentionally used the disruptions to WPEngine hosted websites to

pressure WPE's customers to leave WPE and attempted to poach them to switch to hosting

services owned by Automattic. The plan to reach out to WPEngine clients was in effect no later

than September 26, 2024, based on the internal webpage identified in ¶ 62 and found in Ex. 1 at

89. As part of this plan, Defendants even monitored WPE clients' websites for outages caused by

the disruption to use those outages as a selling point in favor of migrating away from WPE.

*Supra*, ¶ 65. To do so, Defendants knew the identity of WPE's clients and their websites.

114.    The record in this case, which includes the list of targeted and affected WPE

clients published online (Exhibit #4) and the dozens of sales communications targeted to WPE

clients, establishes that Defendants knew exactly who WPE's clients were and interfered with

their WP service agreements intentionally. Every step in Defendants' tortious plan—compiling a

list of WPE clients, internally planning outreach to WPE clients, monitoring WPE client's

websites for outages, and conducting targeted outreach to specific WPE clients—was dependent

on Defendants' knowledge of WPE's clients.

115.    The causal chain between Defendants' blocking action and Plaintiffs' contractual

harm operates through a deterministic technical architecture that leaves no room for speculation.

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

When Plaintiff Keller's or Plaintiff Schanzer's WordPress installations attempted to perform the automated updates promised in their WPE contracts, the following sequence occurred:

    a) WordPress's scheduled task system (WP-Cron) triggered the wp_maybe_auto_update() function;

    b) This function called wp_version_check(), wp_update_plugins(), and wp_update_themes();

    c) Each of these functions initiated HTTP requests to hardcoded api.wordpress.org endpoints;

    d) Defendants' servers rejected the requests, returning connection errors;

    e) The WordPress functions returned error states, and no updates were applied;

    f) The automated update features promised in Plaintiffs' contracts did not execute.

116.    This was not a passive withholding of access; it was an affirmative technical intervention that required Defendants to modify their server configurations to specifically identify and block WPE traffic while continuing to serve all other WordPress installations worldwide.

## CLASS ACTION ALLEGATIONS

113.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(1)-(3) of the Federal Rules of Civil Procedure, on behalf of themselves, their businesses and a Nationwide Class defined as:

**All persons in the United States who had ongoing active WPE WordPress Web Hosting Plans on or before September 24, 2024 through December 10, 2024.**

114.    Excluded from the Nationwide Class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, coconspirators, successors, subsidiaries, and assigns. Also excluded from the Nationwide Class are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

115.    This action is brought and may be properly maintained as a class action pursuant to Rule 23. This action satisfies the requirements of Rule 23, including numerosity, commonality, typicality, adequacy, predominance, and superiority.

116.    **Numerosity.** The Nationwide Class is so numerous that the individual joinder of all members is impracticable. While the exact number of Nationwide Class Members is currently unknown and can only be ascertained through appropriate discovery, Plaintiffs, on information and belief, allege that the Nationwide Class includes at least hundreds of thousands of WPE customers including the hundreds of thousands of websites identified by Defendants on their "WP Engine Tracker" website https://wordpressenginetracker.com.

117.    **Commonality.** Common legal and factual questions exist that predominate over any questions affecting only individual Class Members. These common questions, which do not vary among Class Members, and which may be determined without reference to any Class Member's individual circumstances, include, but are not limited to:

a.    Whether Defendants had implied contracts with Plaintiffs and the putative class;

b.    Whether Defendants had a duty to keep WordPress "free for everyone";

c.    Whether Defendants intended to interfere in the relationship between WPE and Plaintiffs and the putative Class;

d.    Whether Defendants actually interfered in the relationship between WPE and Plaintiffs and the putative Class;

e.    Whether Defendants engaged in independently wrongful conduct.

f.    Whether Defendants' actions constitute unfair competition.

g.    Whether Plaintiffs and Class Members were harmed.

h.    Whether Plaintiffs and Class Members are entitled to actual, statutory, or other forms of damages and other monetary relief; and,

i.    Whether Plaintiffs and Class Members are entitled to equitable relief, including injunctive relief or restitution.

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

118.    **Typicality.** Plaintiffs' claims are typical of other Class Members' claims because Plaintiffs and Class Members were subjected to the same allegedly unlawful conduct and damaged in the same way through having their contracts with WPE disrupted. Therefore, Plaintiffs and the Class overpaid on their contracts with WPE due to Defendants' actions to limit WPE's access to the WordPress ecosystem, including regular updates, tools, Plugins, and other software, which meant that WPE could not perform for Plaintiffs or the Class the services contracted for.

119.    **Adequacy of Representation.** Plaintiffs are adequate class representatives because they are Class Members, and their interests do not conflict with the Class's interests. Plaintiffs retained counsel who are competent and experienced in class action litigation. Plaintiffs and their counsel intend to prosecute this action vigorously for the Class's benefit and will fairly and adequately protect their interests.

120.    **Predominance and Superiority.** The Class can be properly maintained because the above common questions of law and fact predominate over any questions affecting individual Class Members. A class action is also superior to other available methods for the fair and efficient adjudication of this litigation because individual litigation of each Class member's claim is impracticable. Even if each Class member could afford individual litigation, the court system could not. It would be unduly burdensome if thousands of individual cases proceed. Individual litigation also presents the potential for inconsistent or contradictory judgments, the prospect of a race to the courthouse, and the risk of an inequitable allocation of recovery among those with equally meritorious claims. Individual litigation would increase the expense and delay to all parties and the courts because it requires individual resolution of common legal and factual questions. By contrast, the class-action device presents far fewer management difficulties and provides the benefit of a single adjudication, economies of scale, and comprehensive supervision by a single court.

121.    **Declaratory and Injunctive Relief.** The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendants. Such individual actions would create a risk of adjudications that would be dispositive

of the interests of other Class Members and impair their interests. Defendants have acted and/or refused to act on grounds generally applicable to the Class, making final injunctive relief or corresponding declaratory relief appropriate.

## CLAIMS FOR RELIEF

### Count One
### Intentional Interference with Contractual Relations
### On behalf of Plaintiffs and the Class

122. Plaintiffs incorporate by reference and reallege each allegation above as though fully set forth herein.

123. At all relevant times (at or before September 20, 2024), there were valid contracts between Plaintiffs and Class Members and the third party WPE.

124. At all relevant times, Defendants knew that class members maintained valid contracts with the third party WPE.

125. As alleged herein, Defendants deliberately acted with the intent to disrupt those contracts through cutting off WPE's access to WordPress's technology, software, Plugins, and other tools thereby ensuring that WPE could not fully fulfill its contractual obligations to the Plaintiffs and Class Members for website hosting and related services, or if WPE could find a workaround to block of access to WordPress's technology, software, Plugins, and other tools to fulfill its obligations, it made performance of WPE's contracts with its customers more expensive and difficult.

126. For example, during the disruption, neither Plaintiff received the contracted-for WordPress updates, security patching and plugin risk scans, or fully managed WP updates, and instead had to perform all those functions themselves.

127. As a result, Defendants' conduct has prevented and may prevent full performance of the contracts in the future depending on the outcome of WPE's case against Defendants. Defendants' conduct meant that WPE could not install or update Plugins or themes, had limited access to software updates, editing tools, and access control to the WordPress central repository, which meant WPE could not perform necessary contractual functions that Plaintiffs and the Class

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

paid WPE to perform. Further, Plaintiffs and the Class experienced significant service interruptions and their contracts with WPE guaranteed certain levels of service, which as detailed above, WPE was unable to fulfill due to Defendants' conduct. As a result of Defendant's targeted conduct, Plaintiffs and the Class did not receive the benefit of their bargain with WPE.

128.    Plaintiffs and Class Members have been and will be harmed, and Defendants know of this harm (including because Defendants, including Mullenweg, acknowledged the harm in interviews and have made public statements concerning the harm) and were a substantial factor in its cause.

**Count Two**
**Intentional Interference with Prospective Economic Relations**
**On behalf of Plaintiffs and the Class**

129.    Plaintiffs repeat and reallege each and every fact, matter, and allegation set forth above and incorporate them by reference as though set forth in full.

130.    As alleged herein, Defendants have intentionally interfered with prospective economic relationships between current and former WPE customers (class members) and their own clients and business partners. Because Plaintiffs, through their businesses, used WPE's managed web hosting services to create and maintain websites for their own clients, Plaintiffs' prospective economic relationship with their current clients, and with potential future clients, were impacted by Defendants' interference.

131.    Plaintiffs and Class Members and WPE would have likely maintained or expanded relationships to the benefit of class members under the prospective relationship.

132.    Defendants knew of these relationships and prospective relationships.

133.    Defendants intended to disrupt those relationships and prospective relationships.

134.    Defendants engaged in independently wrongful conduct in the course of interfering with those prospective relationships including violations of the UCL (Section 17200 California Business and Professions Code).

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

135.    Defendants conduct has and will disrupt those prospective relationships. For example, but for the December 10 injunction, Plaintiffs would have not renewed their contracts with WPE.

136.    Plaintiffs and the Class have been and will be harmed.

137.    Defendant's wrongful conduct has been and will be a substantial factor in the harm.

138.    As a direct and proximate result of the interference, Plaintiffs and the Class are entitled to relief as set forth herein.

**<u>Count Three</u>**
**California Unfair Competition Law, CAL. BUS. & PROF. CODE §§ 17200, *et seq.***
**On behalf of Plaintiffs and the Class**

139.    Plaintiffs, individually and on behalf of the Class, incorporate by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

140.    Plaintiffs plead this claim for equitable relief, including restitution and injunctive relief, in the alternative to their claims for damages.

141.    Defendants violated California's Unfair Competition Law (the "UCL"), CAL. BUS. & PROF. CODE §§ 17200 et seq., by engaging in unlawful, unfair, or fraudulent business acts and practices that constitute acts of "unfair competition" as defined in the UCL with respect to their conduct and actions toward Plaintiffs and the class.

142.    Defendants' actions as alleged herein in this Class Action Complaint constitute an "unlawful" practice as encompassed by CAL. BUS. & PROF. CODE §§ 17200 et seq. because Defendants' intentional disruption of services they promised to keep free and available to everyone in perpetuity in order to ruin a competitor constitute unlawful business practices such as monopolistic practices. Defendants deliberately wielded their power over the WordPress.org website like a cudgel, not only blocking access to the website but forcing visitors to click a checkbox asserting they are not associated with WPE, publishing WPE customer website addresses in an attempt to pressure customers to leave WPE, and repeatedly threatening future consequences

including the risk of additional service disruptions for class members who did not leave WPE. Defendants actions deliberately harmed Plaintiffs, their websites, and their businesses.

143.     Defendants' tortious interference, as alleged herein in this class action complaint, including intentionally disrupting a competitor's service specifically to degrade and undermine the contracted-for services Plaintiffs and the class received under their agreements with WPE, constitutes an unfair unlawful practice under CAL. BUS. & PROF. CODE §§ 17200.

144.     Defendants' actions as alleged in this Class Action Complaint also constitute an "unfair" practice as encompassed by CAL. BUS. & PROF. CODE §§ 17200 et seq., because they offend established public policy and are immoral, unethical, oppressive, unscrupulous, and substantially injurious. The harm caused by Defendants' wrongful conduct outweighs any utility of such conduct and has caused—and will continue to cause—substantial injury to the Class, including Plaintiffs. In particular, Defendants' abuse of the open-source internet architecture and apparent singular control over what they claim to be more than 40% of all websites in the world through a single individual (Matt Mullenweg)'s personal website (WordPress.org), is an appalling deception and is contrary to every conceivable public policy.

145.     Moreover, public policy cannot support Defendants' actions. A trademark dispute, even if legitimate, is not cause for the deliberate sabotage of the websites of innocent third-party individuals and companies (class members) who merely used WPE services. Defendants' patterns of unscrupulous behavior deliberately targeted at class members' websites in order to get the class member websites' business for themselves demonstrates that these trademark claims are a mere pretext for their unlawful and injurious conduct.

146.     As a result of Defendants' unlawful and unfair conduct, Plaintiffs and the Class were damaged and injured by the significant costs of remedying Defendants' disruption of their websites.

147.     Defendants' wrongful practices constitute a continuing course of unfair competition because Defendants continued and indeed enhanced their efforts to interfere with the relationships between Class Members and WPE up until the December 10, 2024 preliminary injunction. In the absence of a permanent injunction, on information and belief, Defendants will resume attempting to

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

disrupt WPE services and will further harm class members. Indeed, in the absence of a permanent injunction, Plaintiffs will have no option but to terminate their relationships with WPE because of the danger Defendants' unlawful and unfair business practices pose to their livelihood.

148.    Plaintiffs and the class seek equitable relief pursuant to Cal. Bus. & Prof. Code § 17203 to end Defendants' wrongful practices including requiring Defendants to cease its tortious interference with contract.

149.    Plaintiffs and the Class also seek an order requiring Defendants to make full restitution of all monies it received through its wrongful conduct, along with all other relief permitted under Cal. Bus. & Prof. Code §§ 17200 *et seq.*

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class set forth herein, respectfully request the following relief:

A.    That the Court certify this action as a class action and appoint Plaintiffs and their counsel to represent the Class;

B.    That the Court grant permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein and directing Defendants to cease interference in the contractual relationship between WPE and the class;

C.    That the Court award compensatory, consequential, and general damages, including nominal damages as appropriate, as allowed by law in an amount to be determined at trial;

D.    That the Court award statutory or punitive damages as allowed by law in an amount to be determined at trial;

E.    That the Court order disgorgement and restitution of all earnings, profits, compensation, and benefits received by Defendants as a result of Defendants' unlawful acts, omissions, and practices;

SCHUBERT JONCKHEER & KOLBE LLP
2001 Union Street, Suite 200
San Francisco, CA 94123
(415) 788-4220

F.    That the Court award to Plaintiffs and Class Members the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

G.    That the Court award pre- and post-judgment interest at the maximum legal rate; and

H.    That the Court order all such other relief as it deems just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial on all claims so triable.

Dated: January 15, 2026               */s/ Amber L. Schubert*

**SCHUBERT JONCKHEER & KOLBE LLP**
ROBERT C. SCHUBERT (S.B.N. 62684)
rschubert@sjk.law
AMBER L. SCHUBERT (S.B.N. 278696)
aschubert@sjk.law
DANIEL L.M. PULGRAM (S.B.N. 354569)
dpulgram@sjk.law
2001 Union Street, Suite 200
San Francisco, California 94123
Telephone: (415) 788-4220

**TYCKO & ZAVAREEI LLP**
SABITA J. SONEJI (S.B.N. 224262)
ssoneji@tzlegal.com
1970 Broadway, Suite 1070
Oakland, California 94612
Telephone: (510) 254-6808